**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

DEE ANNA CORNELL,

                Plaintiff,

v.                              CIVIL ACTION NO. 2:24-cv-00120

WEST VIRGINIA DIVISION OF
CORRECTIONS & REHABILITATION,

                Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed *Defendant West Virginia Division of Corrections and Rehabilitation's Motion to Dismiss* (Document 18), *Defendant West Virginia Division of Corrections and Rehabilitation's Memorandum of Law in Support of Motion to Dismiss* (Document 19), *Plaintiff's Response in Opposition to Defendant's Motion to Dismiss* (Document 20), and *Defendant West Virginia Division of Corrections and Rehabilitation's Reply to Plaintiff's Response to Defendant's Motion to Dismiss* (Document 21). For the reasons stated herein, the Court finds that the motion should be **DENIED**.

**FACTUAL ALLEGATIONS**

The Plaintiff, Dee Anna Cornell, initiated this action with the filing of a *Complaint* (Document 1) against the Defendant, West Virginia Department of Corrections and Rehabilitation (WVDCR), on March 13, 2024.

1

Ms. Cornell's right leg was amputated below the knee on October 13, 2022, due to severe infection. Eleven days later, on October 24, 2022, she entered Lakin Correctional Center (LCC). LCC is a women's correctional facility located in Mason County, West Virginia, and is operated by the WVDCR.[1]

Individual Reentry Program Plans (IRRPs) set out programs required to be completed by inmates before parole can be granted. Some inmates are required by their IRRP to complete Residential Substance Abuse Treatment (RSAT) to be considered for parole. The treatment regimen through RSAT, a federally funded program[2], lasts between six and twelve months. Individuals in the RSAT program live separate from non-RSAT inmates in designated RSAT Units. In testimony before the Jails Committee of the West Virginia Legislature on January 18, 2024, WVDCR Commissioner William Marshal III stated that the residential aspect of the RSAT program is "key", as program participants have the opportunity to "live and feed off of one another . . . as far as the motivation and desire to be clean and to complete the program." (Compl. at ¶ 15.) Commissioner Marshall noted the importance of inmates bonding and building with one another in the residential program and stated that the WVDCR would make "whatever accommodations" necessary for RSAT inmates to meet their parole obligations. (*Id*.)

Ms. Cornell started the RSAT program on April 12, 2023, approximately six months after her amputation. At that point in her amputation recovery, Ms. Cornell used a wheelchair. The RSAT program is located in the A-Wing of the J-Building at LCC. The A-Wing is not handicap accessible, which posed challenges to Ms. Cornell's ability to be present on the RSAT Unit in A-

---

1 As discussed later and as required at this stage of the litigation, the Court accepts the factual allegations in the Complaint to be true.
2 The WVDCR RSAT program receives federal funding from the Residential Substance Abuse Treatment for State Prisoners Program (RSAT) Grant) set forth in the Violation Crime Control and Law Enforcement Act of 1994.

Wing.  The nearest handicap accessible restroom was in C-Wing and there was not enough space

for Ms. Cornell to move freely about A-Wing in her wheelchair.  On Ms. Cornell's first night in

the RSAT Unit, she fell in the shower because of A-Wing's inadequate handicap accessibility

features.  There was also an instance where Ms. Cornell struggled to exit A-Wing during a fire

drill, resulting in a staff member commenting that Ms. Cornell would have been "in trouble" had

a real fire occurred.  (*Id.* at ¶ 25.)

Because of A-Wing's lack of accessibility, Ms. Cornell, along with her handicap aid, was

moved to C-Wing, which is the paws4prisons (Dog Program) housing unit.  Although Ms. Cornell

returned to A-Wing to participate in RSAT activities, she did not feel that she was able to develop

a bond or connection with the other women in the RSAT program.  Further, Ms. Cornell was told

she was not allowed to speak with the women in C-Wing and could not interact with their dogs.

While not in the A-Wing for RSAT activities, Ms. Cornell was isolated and unable to interact with

anyone in C-Wing other than her handicap aid.  On July 28, 2023, Ms. Cornell became a Mentor

in the RSAT program, but was removed from this position less than two weeks later on August

10, 2023.  Ms. Cornell believes this removal was a consequence of her living outside of the RSAT

Unit.

When Ms. Cornell asked staff if it would be possible for the RSAT program to move to a

unit she could live in full-time with the other participants, she was informed that a relocation of

the RSAT program would not happen and that she was "overreacting."  (*Id*. at ¶ 28.)  On September

19, 2023, Ms. Cornell expressed her concerns about struggling to connect with other RSAT

participants to WVDCR employees Phillip Putney, the Unit Manager, Lynn Roslinski, a Substance

Abuse Therapist, and Angela Rice, a Correctional Counselor.  That same day, she filed a grievance

stating that she was experiencing emotional distress because she could not live and bond with the

other RSAT participants in A-Wing because the unit was not handicap accessible. Ms. Cornell noted in the grievance that the program's teachings of unity, bonding, and awareness only applies to people with "both legs." (*Id*. at ¶ 35.) She requested that A-Wing either be made handicap accessible or that the RSAT program be removed from her programming requirements. She also sent a letter to Commissioner Marshall on October 6, 2023, detailing the struggles she faced being housed away from the other RSAT participants, her difficulty navigating the narrow room where RSAT programming occurred, and the differences between her situation and other disabled inmates who had completed the RSAT program.

The COVID-19 pandemic further impacted Ms. Cornell's participation in the RSAT program and her living conditions at LCC. On October 12, 2023, she was locked down in C-Wing for quarantine and not able to interact with RSAT participants. She filed a grievance on the same day regarding C-Wing's lack of access to recreation time that A-Wing received during COVID-19 lockdown. Additionally, Ms. Cornell was not consistently provided with her insulin for her diabetes when she was locked down in C-Wing. Further, because she was typically away from C-Wing during the lunch period, she was not provided with a lunch tray for four days.

Ms. Cornell also experienced problems with her prosthetic leg while at LCC. On April 18, 2023, she was fitted at Hanger Prosthetics with a prosthesis, which was assessed again on June 6, 2023. She filed a grievance on September 20, 2023, stating that her leg had fallen off three times. Although her provider recommended a follow-up visit within a few weeks after her June visit, she was not seen again until November 14, 2023. At that appointment, her provider noted that the prosthesis liners were ill fitting and not hygienic.

Despite Ms. Cornell's concerns regarding her disability, the Central Office ADA informed her on November 20, 2023, that the accommodations provided by LCC were adequate under ADA

4

guidelines.  She was released from LCC on parole on January 15, 2024. The Plaintiff asserts the following causes of action: Count One – Violation of Title II of the Americans with Disabilities Act (ADA) and Count Two – Violation of the Rehabilitation Act.  She seeks compensatory damages, punitive damages, and attorneys' fees.

## STANDARD OF REVIEW

The Defendant moves for dismissal under either Federal Rule of Civil Procedure Rule 12(b)(1) or Rule 12(b)(6) for the Plaintiff's ADA claim, asserting sovereign immunity under the Eleventh Amendment, and moves for dismissal under Rule 12(b)(6) for the Plaintiff's Rehabilitation Act claim.

There is no consensus in the Fourth Circuit whether a dismissal based on Eleventh Amendment sovereign immunity should be decided under Rule 12(b)(1) for lack of subject matter jurisdiction or under Rule 12(b)(6) for failure to state a claim.  *Andrews v. Daw*, 201 F.3d 521, 525, n.2 (4th Cir. 2000).  "The recent trend, however, appears to treat Eleventh Amendment immunity motions under Rule 12(b)(1)."  *Skaggs v. W. Reg'l Jail*, No. 3:13-3293, 2014, WL 66645, at *4 (S.D. W. Va. Jan. 8, 2014) (Chambers, J.) (citations omitted).

### A.  Motion to Dismiss Under Rule 12(b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) raises the fundamental question of whether a court is competent to hear and adjudicate the claims brought before it.  Challenges to jurisdiction under Rule 12(b)(1) may be raised in two distinct ways: "facial attacks" and "factual attacks." *Thigpen v. United States*, 800 F.2d 393, 401 n.15 (4th Cir. 1986), *rejected on other grounds*, *Sheridan v. United States*, 487 U.S. 392 (1988).   A facial attack is made when jurisdiction is challenged solely on the pleadings, and not on any additional evidence.  *Id*. (citations

omitted).  If a facial attack is made, the court must accept the allegations in the complaint as true and decide if the complaint is sufficient to confer subject matter jurisdiction.  *Id.*

A factual attack is made when truthfulness of the factual allegations in the complaint are challenged.  *Id*.  District courts are instructed to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citations omitted).  The party seeking jurisdiction also has the burden of proving that subject matter jurisdiction exists if there is a factual challenge to jurisdiction.  *See id*.  Dismissal for lack of subject matter jurisdiction is proper only if there is no dispute regarding the material jurisdictional facts and the moving party is entitled to prevail as a matter of law.  *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999).

### B.  Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a complaint or pleading.  *Francis v. Giacomelli,* 588 F.3d 186, 192 (4th Cir. 2009); *Giarratano v. Johnson,* 521 F.3d 298, 302 (4th Cir. 2008).  Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Additionally, allegations "must be simple, concise, and direct."  Fed. R. Civ. P. 8(d)(1).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 555 (2007)).  In other words, "a complaint must contain more than labels and

6

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Moreover, "a complaint [will not] suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal,* 556 U.S. at 678 (*quoting Twombly,* 550 U.S. at 557) (internal quotation marks omitted).

The Court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007). The Court must also "draw[ ] all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). However, statements of bare legal conclusions "are not entitled to the assumption of truth" and are insufficient to state a claim. *Iqbal,* 556 U.S. at 679. Furthermore, the court need not "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., v. J.D. Assocs. Ltd. P'ship,* 213 F.3d 175, 180 (4th Cir. 2000). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice . . . [because courts] 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555).

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). In other words, this "plausibility standard requires a plaintiff to demonstrate more than 'a sheer possibility that a defendant has acted unlawfully.'" *Francis,* 588 F.3d at 193 (quoting *Twombly,* 550 U.S. at 570). A plaintiff must, using the complaint, "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief." *Francis,* 588 F.3d at 193 (quoting *Twombly,* 550 U.S. at 557). "Determining whether a complaint states [on its face] a plausible claim for relief [which can survive a motion to

dismiss] will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679.

## DISCUSSION

The WVDCR urges the Court to find that it is entitled to sovereign immunity under the Eleventh Amendment regarding the Plaintiff's Title II ADA claim.  It also argues that the Plaintiff failed to plead sufficient facts to support a Title II ADA claim.  It further asserts that the Plaintiff's Rehabilitation Act claim fails for the "same reasons" the Plaintiff's Title II ADA claim fails. (Def.'s Mem. at 4.)  In response, the Plaintiff argues that the WVDCR is not entitled to sovereign immunity, that she has sufficiently pled a discrimination claim under Title II of the ADA, and that she has sufficiently pled a discrimination claim under the Rehabilitation Act.

### A.  Plaintiff's ADA Claim and Eleventh Amendment Sovereign Immunity

The Defendant is challenging jurisdiction solely on the pleadings and has put forth no additional evidence, thus presenting a facial challenge to the Plaintiff's Complaint under Rule 12(b)(1).  Therefore, the Court accepts all the Plaintiff's allegations in the complaint as true for purposes of considering the Defendant's motion to dismiss as required by both Rule 12(b)(1) for facial challenges and Rule 12(b)(6).

The Eleventh Amendment of the United States provides that the States are immune from "any suit in law or equity, commenced or prosecuted . . . by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI.  Such immunity extends to suits by a State's own citizens.  *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (citations omitted).  Sovereign immunity "bars suit in federal court against an unconsenting state and any governmental units that are arms of the state."  *Coleman v. Maryland Court of Appeals*,

626 F.3d 187, 190 (4th Cir. 2010). WVDCR is a governmental entity operating as an arm of the State of West Virginia. *See* W. Va. Code § 15A-3-2 (establishing WVDCR within the Department of Military Affairs and Public Safety).

However, sovereign immunity is not entirely absolute, and States may be subject to suit in either of two circumstances. First, a State may waive its immunity in federal court if it chooses to do so and consents to suit. *Sossamon v. Texas*, 563 U.S. 277, 284 (2011) (citing *Clark v. Barnard*, 108 U.S. 436, 447–48 (1883)). Second, Congress can abrogate Eleventh Amendment sovereign immunity by expressing its unequivocal intent to do so and acting pursuant to a valid exercise of its prophylactic enforcement power under Section 5 of the Fourteenth Amendment. *Kimel v. Florida Bd. Of Regents*, 528 U.S. 62, 73 (2000); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). WVDCR has not consented to suit, and thus, Congress must have both unequivocally expressed its intent to abrogate sovereign immunity and acted within its power to abrogate sovereign immunity for the Complaint to survive the Defendant's motion to dismiss.

Considering the context at issue here, an alleged violation of Title II of the ADA in a state prison, the Court finds that WVDCR is not entitled to sovereign immunity. In enacting Title II of the ADA, Congress set forth an unequivocal expression of its intent to abrogate Eleventh Amendment sovereign immunity. *U.S. v. Georgia*, 546 U.S. 151, 154 (2006) (citing *Garrett*, 531 U.S. at 363–64). Namely, Section 12202 of the ADA states in relevant part that "[a] State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in [a] Federal or State court of competent jurisdiction for a violation of this Act." 42 U.S.C. § 12202. The Supreme Court has held that "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Georgia*, 546 U.S. at 159 (emphasis in original).

The Court further clarified what lower courts should consider when determining whether sovereign immunity bars a Title II ADA claim:

(1) which aspects of the State's alleged conduct violated Title II;
(2) to what extent such misconduct also violated the Fourteenth Amendment; and
(3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id.*

Here, the Plaintiff has not asserted separate claims under the Fourteenth Amendment in her complaint. She raises only statutory claims under Title II of the ADA, Section 504 of the Rehabilitation Act, and Section 1983 of Title 42 of the U.S. Code. The Defendant argues that because the Plaintiff failed to specifically allege a Fourteenth Amendment claim in her Complaint, the Court does not need to apply the analysis set forth in *Georgia*. Inversely, the Plaintiff argues that she is not required to actually assert a claim under the Fourteenth Amendment but acknowledges that such a claim would be helpful to the Court, and requests to amend her complaint to include a Fourteenth Amendment claim. While the Defendant is correct that it is well established that parties cannot amend their complaints through briefing, this Court does not read *Georgia* to require plaintiffs to specifically and separately allege a Fourteenth Amendment claim. *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984); *accord E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 449 (4th Cir. 2011). Finding otherwise would require ignoring the clear instructions the Supreme Court in *Georgia* provided to lower courts considering whether a State retains its Eleventh Amendment sovereign immunity when sued under Title II of the ADA. *Georgia*, 546 U.S. at 159.

*1. Aspects of the State's Conduct that Violated Title II of the ADA*

WVDCR argues that the Plaintiff's Complaint fails to set forth a valid Title II ADA claim because Ms. Cornell was not denied the benefits of the RSAT program and was provided reasonable accommodations to have meaningful access to the RSAT program. Further, it argues that the Plaintiff's Complaint fails to demonstrate deliberate indifference, preventing her from being awarded her requested relief of compensatory damages. In response, the Plaintiff states that WVDCR's assertion that it provided reasonable accommodations presents a question of fact that requires discovery and that her access to the RSAT program was not meaningful.

Title II of the ADA prohibits public entities, such as state prisons, from discriminating in the distribution of public services. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). The Fourth Circuit has addressed the application of the ADA and Section 504 of the Rehabilitation Act, both asserted in this case, and indicated that both statutes "prohibit discrimination against an individual because of his or her disability." *Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018). The analysis of the claims is "substantially the same." *Id.*

> To establish a violation of either statute, plaintiffs must prove (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program or activity, or otherwise discriminated against, on the basis of their disability.

*Id.* (quoting *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016)). "The two statutes differ only with respect to the third element, causation." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012). The ADA requires proof that "the disability was a motivating cause of the exclusion," while the Rehabilitation Act requires that the plaintiff prove "he was excluded solely by reason of his disability." *Id.* at 461–62 (internal punctuation omitted) (citing *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999)).

11

Disability is defined as a "a physical . . . impairment that substantially limits one or more major life activities" of an individual. 29 U.S.C. § 705(9)(B); 42 U.S.C. § 12102(1)(A). Walking is one of the enumerated major life activities. 42 U.S.C. § 12102(2). A person is qualified to receive the benefits or services of a program provided by a public entity if she "meets the essential eligibility requirements for participation in a program or activity," "with or without reasonable modifications to rules, policies, or practices." *Halpern*, 669 F.3d at 462 (internal quotation marks omitted); 42 U.S.C. § 12132.

The Supreme Court has found that activities, services, and programs provided by prisons have a wide range of benefits, any of which "disabled prisoners could be excluded from participation in." *Yeskey*, 524 U.S. at 210. (internal quotations omitted). Prisons are thus required to ensure that qualified inmates are not "excluded from participation in, [or] denied the benefits of, the services, programs, or activities" "because a facility is inaccessible to or unusable by individuals with disabilities." 28 C.F.R. § 35.152(b)(1). Prisons must also house disabled inmates "in the most integrated setting appropriate to the needs of the individual" and "shall not place inmates . . . in facilities that do not offer the same programs as the facilities where they would otherwise be housed." *Id*. § 35.152(b)(2), (b)(2)(iii). When a qualified inmate brings a challenge under Title II, courts must consider whether the inmate was provided "meaningful access" to a benefit, service, or program. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). Perfect access, however, is not required. *Koon v. North Carolina*, 50 F.4th 398, 406 (4th Cir. 2022) (quoting *Wright v. N.Y. Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016)).

Reasonable modifications are required by the ADA if such a modification would not fundamentally alter the nature of the service provided. 28 C.F.R. § 35.150(a). A covered public entity need not undertake an "undue financial and administrative burden" in providing a

modification, however. *Id.* Whether an accommodation is reasonable is viewed "through the lens of operating a prison," which lends deference to prison officials. *Richardson v. Clarke*, 52 F.4th 614, 621 (4th Cir. 2022) (citations omitted).

When seeking compensatory damages for a violation of the ADA, plaintiffs must prove intentional discrimination. *Koon*, 50 F.4th at 400. (citing *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 n.9 (4th Cir. 1994); *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999)). There are two approaches courts use when deciding whether intentional discrimination has occurred: deliberate indifference or "something more." *Id.* at 404. The Fourth Circuit has not yet determined the controlling standard, but notes that a majority of circuits favor the deliberate indifference test, and recently applied the test where an inmate asserted ADA claims against North Carolina and two prison employees. *Id.* The deliberate indifference standard is a two-prong test and requires plaintiffs to demonstrate (1) that there was an ongoing or likely violation of a federal right and (2) that the defendant had the appropriate mental state regarding the federal rights violation. *Id.* The first prong is an objective test, and the second prong is a subjective test. *Id.* A mental state of deliberate indifference requires "knowledge of a substantial risk of a deprivation of those rights and a failure to act to resolve that risk." *Id.* at 405. A public entity's simple failure to comply is not sufficient to establish the required mental state; there must be a conscious or deliberate choice by the public entity. *Id.* at 406. (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).

WVDCR is a public entity and is subject to the requirements of Title II of the ADA. Again, the Court accepts as true all facts alleged by the Plaintiff, as required when considering a motion to dismiss. Ms. Cornell has a physical impairment, the partial loss of her right leg, which limits her ability to walk, a major life activity, and requires her to use either a wheelchair or a prosthetic. She therefore meets the ADA definition of disabled. Additionally, Ms. Cornell was qualified to

receive the benefits of, and participate in, the RSAT program, as evidenced by the fact that completion of the RSAT program was required by her IRRP, to facilitate her release on parole. Thus, the Plaintiff has clearly alleged the first and second elements of a successful ADA claim, neither of which are disputed by WVDCR.

The third element of Ms. Cornell's claim, whether she was denied the benefits of the RSAT program and discriminated against based on her disability, is where the parties disagree. WVDCR argues that the Plaintiff has not adequately alleged a successful Title II ADA claim because her claim requires that either A-wing be fundamentally altered to accommodate her or that A-Wing inmates be moved to a different location, which would be an unreasonable accommodation. Further, the Defendant argues that Ms. Cornell had meaningful access to the RSAT program because she was away from the program and participants only during non-programming hours. According to the Defendant, Plaintiff's request to have full access to the RSAT program, particularly the communal living aspect of it, is a request for perfect access. The Defendant states that because Ms. Cornell did not allege that she *experienced* a serious injury in an emergency on A-Wing, just that she was *at risk* of such an injury due to A-Wing's inaccessibility, any accommodation afforded to remedy this issue would have been unreasonable and an undue burden on prison officials. Finally, WVDCR asserts that because it appears that the Plaintiff completed the RSAT program[3] and the Central Office ADA informed her that the accommodations provided to her were adequate, it lacked knowledge that a violation of a federally protected right may have occurred.

---

[3] Whether Ms. Cornell completed the RSAT program is not alleged in the Complaint from which the Court must draw the facts at this stage.

In response, Ms. Cornell alleges that she was deprived meaningful access to the RSAT program by being denied the instrumental residential aspect of the program. Further, she alleges WVDCR had requisite knowledge it was putting her at risk of injury by maintaining the RSAT program in A-Wing, which was not wheelchair accessible to her. She states that WVDCR took additional discriminatory actions against her by failing to provide proper treatment for her leg prosthesis and by removing her from her mentorship position. Ms. Cornell responds that the accommodations WVDCR provided were not reasonable and did not ensure her meaningful access to the RSAT program.

Although she is only required to show that her disability was a motivating factor for the discrimination for purposes of her ADA claim, Ms. Cornell's allegations, if proven, could support a finding that her disability was the sole basis for being denied the benefits of the RSAT program. In her Complaint, she alleges that she was denied access to the residential aspect of the RSAT program by being moved to C-Wing. She was moved to C-Wing solely because of her disability, the housing and bathrooms in A-Wing were inaccessible and both limited her movement and caused her injury when she fell in the shower. Accepting the allegations as true, WVDCR's Commissioner testified that the residential aspect of the RSAT program is imperative, yet WVDCR denied her the ability to reside with the other participants. Ms. Cornell's accommodation requests, either for A-Wing to be made accessible or for the inmates on C-Wing and A-Wing to swap housing, were denied without further inquiry. Regulations governing the ADA clearly state that an inmate cannot be housed in a facility that does not offer the same program for which the inmate is otherwise qualified.

Ms. Cornell additionally alleges that WVDCR discriminated against her in violation of the ADA in several other instances because of her disability. She states that because she was housed

in C-Wing rather than A-Wing with the other RSAT participants, she was denied regular access to her insulin, lunch trays on four occasions, and access to passive recreation that A-Wing received. All these incidents occurred while Ms. Cornell was in C-Wing during COVID-19 lockdown.  The Plaintiff alleges that the denial of her insulin and lunch trays occurred because she was not typically present in C-Wing during the day, but instead was typically at RSAT programming.  Also due to Ms. Cornell being housed in C-Wing, she alleges that she was effectively placed in solitary confinement because she was instructed by an RSAT counselor that she could not interact with others on C-Wing, and that she was removed from her mentorship position in the RSAT program.  Again, Ms. Cornell has stated that she was housed in C-Wing solely because of her disability, making each of these instances plausible violations of Title II of the ADA.

As discussed throughout this section, Ms. Cornell has sufficiently alleged that there was an ongoing violation of her federal rights, specifically her right to be free from discrimination based on her disability.  The Plaintiff has also carried her burden to allege sufficient facts that the Defendant acted with deliberate indifference in discriminating against her.  Ms. Cornell raised several of these instances of discrimination with WVDCR.  She spoke to three WVDCR employees on September 19, 2023, about her inability to fully participate in the RSAT program and filed a grievance that same day outlining those concerns and requesting that A-Wing be made accessible. She also sent a letter to the WVDCR Commissioner, alerting him that she was housed separately from the RSAT program community because of her disability.  Too, the Plaintiff filed a grievance regarding the different recreation access A-Wing received during COVID-19 lockdown.  The Defendant was further on notice that the accessibility in A-Wing was insufficient, and that a potential ADA violation occurred, when Ms. Cornell struggled to leave A-Wing during a fire drill, resulting in a WVDCR employee commenting about the amount of time it took her to leave A-

Wing.  In each of these instances, the Defendant failed to take action to either make A-Wing accessible or move the RSAT program to an accessible unit.  The Defendant was notified several times of the likely ADA violations and continued to make the conscious choice to do nothing to remedy these violations.  Thus, based on these allegations, Ms. Cornell has sufficiently claimed deliberate indifference.

The singular instance in which Ms. Cornell has failed to allege sufficient facts that the Defendant's conduct violated Title II of the ADA is the Defendant's allegedly inadequate and delayed provision of medical care for her prosthetic leg.  Unless the failure to provide adequate medical care is motivated by the prisoner's disability itself, the prison's conduct will not be found to violate Title II of the ADA.  *Spencer v. Easter*, 109 Fed.Appx. 571, 573 (4th Cir. 2004) (citing *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996)).  Ms. Cornell has alleged no such facts and has thus failed to state a claim on this issue.

In all other instances, whether the Defendant's conduct is ultimately found to violate Title II of the ADA is a burden the Plaintiff must meet by producing sufficient evidence to support her allegations.  At this stage, the Court finds that the allegations in the Complaint are sufficient to establish a plausible claim that the Defendant's conduct violated Title II of the ADA, satisfying the first prong of the *Georgia* test.

### 2.  *Extent Such Misconduct Violated the Fourteenth Amendment*

To meet the second prong of the *Georgia* test and show that Congress validly abrogated sovereign immunity with respect to Ms. Cornell's claims, she must allege facts showing that the Defendant's conduct also violated the Fourteenth Amendment.  The Equal Protection Clause of the Fourteenth Amendment declares that "[n]o State shall . . .  deny to any person within its jurisdiction   the equal protection of   the   laws."    U.S.   Const.   amend.   XIV,   §   1.

17

The equal protection clause "limits all state action, prohibiting any state from denying a person equal protection through the enactment, administration, or enforcement of its laws and regulations." *Front Royal & Warren County Indus. Park Corp. v. Town of Front Royal*, 135 F.3d 275, 289 (4th Cir.1998) (internal quotation marks & emphasis omitted). As a consequence, the Fourth Circuit has been clear that the Fourteenth Amendment does not create a cause of action for any deprivations of the rights contained in the Constitution. *See Hughes v. Bedsole*, 48 F.3d 1376, 1383 n. 6 (4th Cir.1995). Instead, it is Section 1983 of Title 42 of the United States Code that provides the statutory cause of action for abuses of the protections contained in the Fourteenth Amendment of the Constitution. *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 119–120 (1992).

A Fourteenth Amendment equal protection claim, as enforced by 42 U.S.C. § 1983, requires that a plaintiff "demonstrate that he has been treated differently from others with whom he is similarly situated, and that the unequal treatment was the result of intentional or purposeful discrimination. If a plaintiff makes this showing, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." *Veney v. Wyche*, 293 F.3d 726, 730–31 (4th Cir. 2002) (quoting *Morrison v. Garraghty*, 239 F. 3d 648, 654 (4th Cir. 2001)).

"When equal protection challenges arise in a prison context . . . courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner." *Id.* at 732. Under this deferential standard, a prisoner must allege that the disparate treatment they experienced was not reasonably related to any legitimate penological interests. *Id.* The Supreme Court in *Turner v. Safley* delineated four factors courts should consider when deciding whether a prison policy or regulation that violates an inmate's

constitutional rights is reasonably related to a legitimate penological interest: (1) whether there is valid, rational connection between prison regulation and legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising rights that remain open to inmates; (3) whether accommodation of asserted rights will have significant "ripple effect" on fellow inmates or prison staff; and (4) whether there is a ready alternative to regulation that fully accommodates prisoners' rights at de minimis cost to valid penological interests.  482 U.S. 78, 89–91 (1987).

The Defendant argues that Ms. Cornell does not state a claim of relief under the Equal Protection Clause because its decision to house Ms. Cornell in C-Wing was rational to prevent further injury to her, that it was rational to limit interaction between Ms. Cornell and the other inmates in C-Wing to maintain the dogs' bonds with their inmate-trainers and avoid triggering the inmates' PTSD symptoms, and that the insulin and meal tray incidents occurred not as a result of discrimination but of forgetfulness, which fails to give rise to an equal protection claim.

On the other hand, the Plaintiff argues that she was treated differently both from other RSAT program participants and other LCC inmates with whom she was similarly situated. Specifically, she alleges that being housed apart from other RSAT participants, being restricted from speaking with the inmates she did live with, and being denied access to recreation time, her insulin, and lunch trays during COVID-19 lockdown, are sufficient to state a claim under the Equal Protection Clause.

The Court finds that the Plaintiff has alleged sufficient facts to state a claim under the Equal Protection Clause of the Fourteenth Amendment.  Although the Court must lend deference to prison officials, Ms. Cornell has plausibly alleged that there was no legitimate penological purpose underlying her discriminatory treatment, and the Court cannot consider evidence outside the

19

pleadings or make credibility determinations at this stage.    Therefore, the Court finds that the Defendant is not entitled to Eleventh Amendment sovereign immunity as the Plaintiff has met the first two prongs of the *Georgia* standard.

> 3. *Violations of ADA Title II that Did Not Violate the Fourteenth Amendment*

Because the Plaintiff has satisfied the analysis set forth in the first two prongs of *Georgia* and plausibly alleged that all the Defendant's conduct that violated Title II of the ADA also violated the Fourteenth Amendment, the Court need not apply the congruence and proportionality test described in *City of Boerne v. Flores*. 521 U.S. 507, 520 (1997).  Again, the Court finds that the Defendant is not entitled to sovereign immunity.

> B. *Plaintiff's Rehabilitation Act Claim*

The Rehabilitation Act prohibits discrimination by recipients of federal funding, including agencies or departments of the federal government, against certain disabled individuals.  29 U.S.C. § 794(a).    As stated above, the analysis of claims under the ADA and Section 504 of the Rehabilitation Act is "substantially the same."   *Wicomico Nursing Home*, 910 F.3d 750.   The Rehabilitation Act requires a more stringent showing that a plaintiff was excluded "solely by reason of his disability."   *Halpern*, 669 F.3d at 461–62 (citations omitted).

WVDCR accepts federal funding and is thus subject to the Rehabilitation Act.  While WVDCR argues that the Complaint fails to set forth a valid Title II ADA claim, and thus cannot state a valid Rehabilitation Act claim, the Court disagrees.  As discussed in depth above, the Plaintiff sufficiently alleged facts that the Defendant discriminated against her solely based on her disability, rather than her disability simply being a motivating factor.  Therefore, the Defendant's request to dismiss the Plaintiff's Rehabilitation Act claim must also be denied.

## CONCLUSION

Wherefore, after thorough review and careful consideration, the Court **ORDERS** that *Defendant West Virginia Division of Corrections and Rehabilitation's Motion to Dismiss* (Document 18) be **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and to any unrepresented party.

ENTER:    October 1, 2024

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA